

SO ORDERED.

SIGNED this 14th day of February, 2012.



Robert E. Nugent
United States Chief Bankruptcy Judge

___

DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRADLEY D. ECK, | ) | Case No. 10-11034 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| RICHARD A. WIELAND, | ) | |
| United States Trustee | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary No. 10-5152 |
| | ) | |
| BRADLEY D. ECK, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

Bankruptcy provides debtors with a fresh start while affording level ground on which their creditors can compete in their battle to be paid a fair share of the estate. To further those aims,

1

Bankruptcy Code § 727(a)(2) penalizes debtors who transfer assets before they file to keep them from creditors by denying such debtors a discharge. And because disclosure is so vital to marshaling the debtor's assets and paying his claims, § 727(a)(4) also denies a discharge for debtors who falsely swear to schedules that do not fully and forthrightly disclose their assets when they file. This case features both a pre-filing transfer to avoid a garnishment and serial failures of disclosure that highlight the importance of these principles and the need to enforce them by granting judgment on the United States Trustee's complaint and denying Bradley D. Eck a discharge.[1]

    I.    <u>Findings of Fact</u>

Bradley Eck is a chiropractor. On September 30, 2009, during his divorce, he filed a chapter 13 petition in this District.[2] His counsel, Sarah J. Newell, filed that case, but later withdrew. David J. Lund replaced Ms. Newell as counsel, but on November 24, 2009, Eck voluntarily dismissed his case, without ever filing bankruptcy schedules or a chapter 13 plan. He did this to allow his divorce proceedings to become final, so that his matrimonial obligations would be liquidated.[3] During the pendency of his first chapter 13 case, Eck purchased a Chrysler 3000 as his personal vehicle but titled the car in the name of IPTOW, LLC, one of his many chiropractic business entities.[4] Eck was beset by other creditors, however, and in an effort to head off a property execution that would result in him losing chiropractic equipment, he filed a second chapter 13 petition *pro se* on December 29, 2009.[5] This case was dismissed

---

[1] Trial was held in this matter on November 29, 2011 and taken under advisement. Joyce Owen appeared on behalf of the plaintiff Richard A. Wieland, United States Trustee. Kenneth H. Jack appeared on behalf of defendant and debtor Bradley D. Eck.

[2] Case No. 09-13234.

[3] The final divorce decree was entered on March 29, 2010. Ex. B.

[4] Ex. 6.

[5] Case No. 09-14272.

2

in February of 2010 after he failed to file his schedules and a chapter 13 plan.

Then Eck filed the present chapter 13 case on April 7, 2010, again *pro se* and without schedules, a statement of financial affairs (SOFA) or a plan. He gained the assistance of a lawyer, James W. Wilson, who filed an amended petition, and Eck's first SOFA and schedules on April 29.[6] Within days of those filings, the case was voluntarily converted to chapter 7 on May 3 and Linda Parks was appointed case trustee. Eck again amended his petition on May 7 and amended some of his schedules on May 20, but not his SOFA or Schedules A and B. These schedules and SOFA contained many material omissions described below. The § 341 meeting of creditors was held on June 1, 2010.

The United States Trustee (UST) filed this adversary proceeding on August 2, 2010 alleging as grounds for denial of Eck's discharge: transfer of property with intent to hinder, delay, or defraud a creditor, § 727(a)(2)(A) and false oath, § 727(a)(4). Both claims center on omissions from his bankruptcy schedules and SOFA. On April 12, 2011 attorney Wilson moved to withdraw as counsel for Eck citing his retirement from legal practice and attorney James Rupper entered his appearance. Rupper withdrew as counsel a month later upon discovery of a conflict of interest. Eck's present counsel, Kenneth Jack, entered his appearance on June 15, 2011 and filed an amended SOFA on July 18, 2011.[7] This was the last amendment to Eck's bankruptcy schedules and SOFA and it was not until these amendments were filed that the omissions alleged by the UST and case trustee were first addressed. And neither Schedule A nor Schedule B were ever amended. At all times, Eck was represented in the adversary by the same progression of lawyers as in his bankruptcy case.

Among the items omitted from Schedule B or SOFA were references to seven bank accounts,

---

[6] Dkt. 12.

[7] Dkt. 124.

two of which were open at the time of filing, April 7, 2010.[8] Though Eck disclosed that he had been a defendant in a foreclosure proceeding related to his former marital home and that the home had been "repossessed," he did not disclose any ownership interest in the property on Schedule A, nor did he indicate that there were any contracts for its sale.[9] Yet, within a month of filing this case, Eck executed a deed to convey the property in a "short sale" to one William Wesolowsky.[10] According to a later amendment, this contract had been executed in March, 2010 before the case was filed.[11] The case trustee only found out about this series of events when the lender filed its motion for stay relief in May of 2010 so that it could complete the short sale process.[12] The discovery of this short sale transaction led to the filing of her own adversary complaint against Eck on August 31, 2010.[13]

Also omitted from debtor's SOFA were seven corporations or limited liability companies that Eck testified were defunct when he filed and were only intended to house different aspects of his chiropractic practice.[14] One of these companies, IPTOW, Inc., was in good standing when the petition

---

[8] On Schedule B Eck listed a single Bank of America account. On his initial SOFA, Question 11, Eck listed 4 closed Emprise Bank accounts. Dkt. 12. On his amended SOFA, he listed an additional 7 closed accounts, including 2 Bank of America accounts closed after the date of his petition. Dkt. 124. One of those BOA accounts was the account listed on Schedule B. The other BOA account was the IPTOW, LLC account that is discussed herein. It was closed nearly 11 months after the bankruptcy was filed.

[9] *See* SOFA, Dkt. 12, Questions 4, 5 and 10.

[10] *See* Ex. H reflecting the closing settlement statement dated May 14, 2010.

[11] *See* Amended SOFA, Dkt. 124, Questions 4, 5 and 10; Ex. F.

[12] Dkt. 28.

[13] *Linda S. Parks, Trustee v. Bradley Eck, et al.,* Adv. No. 10-5186. This adversary was subsequently settled.

[14] *See* SOFA, Dkt. 12, Question 18 and Amended SOFA, Dkt. 124, Question 18.

4

was filed and had an active bank account.[15] It owned the car Eck was driving at filing and claimed exempt – a 2008 Chrysler 300. Only when the trustee discovered the existence of IPTOW, did she discover the true nature of the car title. That allowed her to recover and liquidate the car.

Question 10 of Eck's initial SOFA asks for a listing of transfers of property outside the ordinary course of business made within two years of the petition date. Eck answered that no transfers had occurred.[16] In so doing, he omitted to disclose a transfer of approximately $9,700 from Emprise Bank account number *0162 to an account in the name of his employee, Adrianna McCabe. This account was one of those not disclosed on the initial SOFA, Question 11. Eck effected this transfer by drawing a cashier's check on *0162 in the amount of $9,910 on September 21, 2009.[17] He gave the check to McCabe who deposited it in an Emprise account opened in her name, number *0405, that same day. The address on McCabe's account is 7348 W. 21st Street, Suite 113, the same address as shown on Eck's account *0162 on the date of the transfer.[18] According to his amended SOFA, the purpose of this transfer was to "preserv[e] the availability of said funds for payment of Bradley Eck's empolyee [sic] creditors."[19] In his trial testimony, Eck stated that he made the transfer because he feared garnishment and wanted to preserve the funds to pay his employees.

When Ms. McCabe received the check on September 21, 2009, she made an opening deposit

---

[15] *See* Amended SOFA, Dkt. 124, Questions 11 and 18.

[16] Dkt. 12.

[17] Ex. I, Ex. 10, p. 409.

[18] *See* Ex. I and Ex. 10, p. 404, 409. This is also the same address used for the Eck Management Corporation Emprise account no. *0565 and IPTOW Bank of America account no. *6532. *See* Ex. Y, Ex. BB.

[19] Dkt. 124.

5

of $9,754 into Emprise Bank account number *0405.[20] Eck filed his first chapter 13 case on September 30. The bank statement shows that four checks were written on account *0405 in the amounts of $401.00, $360.00, $519.00 and $492.86. Two of these may have been employee checks; though neither side presented any testimony about this, the Court found recurring checks in the amounts of $401 and $519 written on the IPTOW acct. McCabe received $519 per payment and another employee Filby $401 based upon the Quickbooks expense summary contained in Exhibit 18. The Court found no employee payments in the amounts of $360 or $492. According to Eck's Exhibit I, on October 20, Emprise made an entry titled "adjustment," whereby it debited $7,981 from *0405, bringing the balance down to $0.00.[21] A like amount was deposited October 21 to Bank of America account *0531 in the name of Bradley Eck.[22] On October 28, Eck transferred $7,000 to Bank of America account *6532, the account held in the name of IPTOW.[23] Eck had previously deposited $4,500 in *6532 on October 26 and, on that date, a $240 check cleared followed by one for $519 on October 27. Both these checks were likely payments to Filby and McCabe because Eck's Quickbooks accounting contains references to payments to those individuals in those amounts on that date. As they were written and cleared before the $7,000 deposit, Eck could not have intended to fund those checks with the transferred money. The IPTOW bank statements show over $18,000 being deposited in October, over $23,000 in November, and $14,000 in December. No checks in like amounts appear in the IPTOW account statements after 2009. While it may be that some of the transferred funds were indeed paid to contract employees, there is no way to determine how much, if any, of the $7,000 transferred into the IPTOW account funded those

---

[20] Ex. I.

[21] Ex. I, p. 3.

[22] Ex. 9, p. 000333.

[23] Ex. 8, p. 000304

6

payments.[24] And, during that period, Eck appears to have spent thousands of dollars in restaurants, hotels, airfare, and child support, along with possible business expenses. If he transferred the money with the intention of preserving it to pay his employees, he failed to carry out that intention.

Eck omitted both accounts and entities from his schedules and SOFA. He testified that Emprise account *0162 was his principal business account, but that he used it for personal purposes, too. He closed it in December of 2009, before he filed this case. By then, he had switched to the two Bank of America accounts referenced above (*0531 and *6532).[25] He listed one Bank of America account on his first Schedule B. He stated that he provided attorney Wilson with his account statements and that his failure to list them on his first SOFA was an oversight. He said that he did not list the house because he thought it had already been foreclosed upon and, in any event, he owed more on it than it was worth. A foreclosure decree was entered against the residence on September 8, 2009, and a sheriff's sale conducted on March 10, 2010, but according to Eck, the sale was never confirmed and no confirmation order is in the record before the Court.

After the trustee had discovered many of the missing accounts, entities, and transfers, Eck's present counsel, Kenneth Jack, filed an amended SOFA on July 18, 2011, revising the answers to several questions in his initial SOFA filed April 29, 2010.[26] Even after the amendment to his SOFA, debtor omitted two business sole proprietorships from question 18 -- Body Solutions and Metro Physicians Group, both of which were identified on previously undisclosed bank accounts in question 11.[27]

---

[24] Ex. 18.

[25] Both Bank of America accounts were opened in October 2009, during the pendency of Eck's first case.

[26] Dkt. 124. *Cf.* Dkt. 12 and Dkt. 124, Questions 4.b., 10, 11, 15, and 18.

[27] *See* Ex. 12 (account *9972); Ex. 14(account *0107).

7

II.   Analysis and Conclusions of Law

    A.   Eck's admitted transfer of funds to McCabe to shield them from garnishment was made with the requisite intent to hinder, delay or defraud his creditors.

Section 727(a)(2)(A) sanctions debtors who transfer property to keep it out of their creditors' hands by denying them a discharge. If the debtor, "with intent to hinder, delay, or defraud" a creditor "has transferred, removed, destroyed, mutilated, or concealed" property within one year of the filing, the court "shall [not] grant the debtor a discharge." To prevail here, the U.S. Trustee had to establish, by a preponderance of the evidence, that "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor."[28]

Here, there is no question that the first three elements are proven. Eck transferred over $9,700 to McCabe in the same month of his first filing and well within one year of his April, 2010 filing. Eck himself admitted that he transferred the money to keep it from garnishment and preserve it for the purpose of paying his employees with it. Had he acted on this benign purpose, this transfer might not have thwarted his discharge under subsection (a)(2)(A). Preferring one set of creditors over another has been held to be acceptable conduct in some circumstances. In *Brown*, for instance, the Tenth Circuit reversed a bankruptcy court order denying a discharge to a debtor who granted a lien in a car collection on the eve of filing in order to secure a loan he needed to maintain his business. The Circuit concluded that when a transfer is made for a valid business purpose, it is not grounds for denial of discharge.[29] In *In re Miller*, the Eleventh Circuit reached a similar conclusion when it held that a debtor's sale of real

---

[28] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir.1997); *see also In re Carey*, 938 F.2d 1073, 1076 (10th Cir. 1991); *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001), *aff'd*, 35 Fed. Appx. 811 (10th Cir. 2002).

[29] 108 F.3d at 1293.

8

estate to a creditor in exchange for a debt reduction was reasonable under the circumstances and was really a preferential transfer.[30] The *Miller* court distinguished this sort of transfer from the more typical transfer to friends or family members to preserve or conceal the assets.[31]

The problem here is that Eck transferred at least $9,700 to McCabe, supposedly to pay employees, but only a few of those dollars actually reached his employees. He appears to have spent most of the transferred money, along with thousands more dollars, on living expenses, spousal support, equipment rental, office supplies, and a good deal of entertainment.[32] Comparatively little money went to the employees and what did cannot be directly traced to the transferred funds. Equally troubling here is the fact that Eck never disclosed any of this until the trustee found the IPTOW account. He filed two cases in late 2009, after the transfer occurred, and did not disclose this activity, indeed did not file schedules in either one. Nor did he disclose the transfer when he filed the present case. If this transfer was made to pay his employees, what did Eck have to hide? And why did he transfer the money through the labyrinth of accounts to pay them? Once McCabe had paid the employees out of her account, why didn't she or Eck replace the unused funds in the Eck account from which they came? The UST demonstrated that it was more likely than not that Eck made the transfer to McCabe with intent to hinder, delay or defraud his creditors. That alone is sufficient to deny his discharge in this case.

      B.      <u>Eck's initial schedule and SOFA omissions were false oaths.</u>

To successfully object to Eck's discharge on grounds of a false oath the UST must show that (1) debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the

---

[30] 39 F.3d 301, 307 (11th Cir. 1994).

[31] *Id.* (noting transfers to family members merit closer scrutiny).

[32] The court noted numerous debit card transactions exceeding $100 at restaurants and bars around Wichita, including during the 30 day period McCabe's account was funded. *See* Ex. 18.

9

oath was made knowingly; and (4) the oath was made fraudulently.[33] This determination rests largely on the circumstances of the case and an assessment of the credibility and demeanor of the debtor.[34] A showing of debtor's reckless disregard for the truth is sufficient to prove fraudulent intent.[35] Courts have identified a set of indicia suggestive of fraudulent intent that includes concealment, conversion of assets, and a pattern of sharp dealings.[36] And fraud may sometimes be inferred from a deterioration of the debtor's financial condition after a questioned transaction.[37]

Here, Eck relies on having provided some information about the omitted accounts and assets to Wilson and upon his having finally amended the schedules and SOFA in July of 2011, many months after the initial filing.[38] An inadvertent omission is not fraudulent. Given the breadth of the omissions here, the Court is hard pressed to conclude that the omissions were inadvertent. This is a case rife with omissions. Eck failed to disclose his interest in his former marital home that subsequently sold for

---

[33] *Stamat v. Neary,* 635 F.3d 974, 978 (7th Cir. 2011); *In re Retz,* 606 F.3d 1189, 1197 (9th Cir. 2010).

[34] *Stamat,* supra at 982; *Retz, supra* at 1199; *In re Calder,* 907 F.2d 953, 956(10th Cir. 1990); *In re Garland,* 417 B.R. 805, 815 (10th Cir. BAP 2009).

[35] *Stamat, supra* at 982; *Garland, supra* at 815 (reckless indifference to the truth is functional equivalent of fraud for purposes of § 727(a)(4)(A)); *Miller,* 448 B.R. 551 (Bankr. N.D. Okla. 2011); *Retz, supra* (reckless indifference to truth where debtor signed bankruptcy schedules and SOFA in blank or without reading them).

[36] *Garland, supra* at 815.

[37] *Id.*

[38] With respect to the undisclosed bank accounts, Eck also suggests that they had little to no value because they had been closed. However, at least one undisclosed account was active during his bankruptcy case (the IPTOW account), two more were active during his previous bankruptcy cases, and one account was utilized for the McCabe transfer. Materiality of an omission is not based upon the value of the undisclosed matter; it is material if it bears a relationship to the debtor's business transactions or estate,, or concerns the discovery of assets, business dealings, or the existence and disposition of debtor's property. *See Calder, supra* at 955. Eck's omissions were material.

10

$290,000, the short sale of that home, the transfer of $9,700, at least seven (7) bank accounts (some of which were active at and after filing), and his interest in at least seven (7) entities or sole proprietorships associated with his chiropractic business. But Eck could have negated a showing of fraudulent intent had he come forward with the omitted material *of his own accord*.[39] Instead, the case trustee and the UST were put to considerable effort to ascertain the existence of these assets and activities because of these serial glaring omissions made by Eck in his initial filings in April of 2010. Only after lengthy inquiry on the part of the officers of the estate, after he changed counsel, and after the filing of two adversary proceedings highlighting the omissions did Eck make the necessary amendments. This "deathbed conversion" cannot be equated with amendments made by forgetful debtors "of their own accord."[40]

Eck's conduct reveals a pattern of disregard for the bankruptcy system. He filed three cases in six months. Each filing was made to halt adverse action by creditors. While Eck may have supplied attorney Wilson with all of the missing information, he presented no evidence that would indicate that the omissions of accounts, transfers and assets can be laid at his attorney's door. Eck did not call Wilson to testify. He did not offer Wilson's case file; not even a copy of Wilson's office's bankruptcy questionnaire was presented. Eck had filed two previous cases in the recent months. He filed no schedules or SOFA in either of those cases. He filed his schedules and SOFA late in the instant case. This conduct represents a reckless disregard for the process. Schedules are to be timely and accurately filed to facilitate the marshaling of assets and payment of claims. The requirement that they be filed under oath is made to assure trustees and creditors that the information contained in the schedules is accurate and complete. When it isn't, trustees and creditors are required to fish for the truth, costing

---

[39] *In re Brown, supra* at 1294-95.

[40] *Retz, supra* at 1199 (Failure to amend schedules and SOFA in the three years between the petition and trial can constitute reckless indifference to the truth.).

11

unnecessary effort and expense that saps the recovery of the creditors.

As Ms. Parks testified, she and her staff spent a lot of time ascertaining the existence of the omitted accounts, entities, and the McCabe transfer. Because the SOFA incorrectly referenced the home foreclosure as a "repossession," she made no initial effort to administer the debtor's redemption rights until she learned that the home had not been sold or "repossessed." And, she only learned that when the mortgage creditor sought to annul the stay so that it could complete the short sale. This omission may have deprived the estate of income it could have received from administering and disposing of the asset.[41]

The Court concludes that Dr. Eck acted recklessly when he did not thoroughly review his schedules and SOFA and bring the missing information on them to his attorney's attention. Nor did he amend his SOFA until many months later, only after the trustee independently discovered the missing accounts, entities and assets. While a prompt amendment may negate a conclusion that the debtor has made a false oath, an amendment made after fourteen months under the shadow of a general objection to discharge, with information accumulated by the trustee without the active cooperation of the debtor, is not enough. This debtor was recklessly indifferent to the duties the Bankruptcy Code placed on him and his discharge must be denied because his schedules and statements of affairs amounted to false oaths under § 727(a)(4).

A judgment on the UST's complaint will issue this day, denying Eck a discharge under §

---

[41] I am less convinced that the omission of the house was wilful or reckless, though it did cause the trustee extra work. The sale contract was initiated by his ex-wife without his prior knowledge and after he had moved out of the home a couple of years earlier. A lay person who has seen his house sold at sheriff's sale might well conclude he didn't own it anymore. Still, this is a legal subtlety that Eck's counsel should have seen and pointed out to him. Further, neither Eck nor Wilson disclosed the post-petition signing of the deed "releasing" (as Eck described it) Eck's interest in the home. Eck should have known when he was asked to sign the deed that he retained some interest in the home.

727(a)(4) and § 727(a)(2)(A).

# # #